CHARLES SWANSON, Appellee, v. THE CITY OF OTTUMWA, Appellant.

Action to Enjoin Issuance of Bonds: SPECIAL TAX: STATUTES CONSTRUED. Code, sections 742-745 and 894 do not in terms nor by necessary implication provide for the creation of any indebtedness by a city in excess of the constitutional limit and are not therefore unconstitutional.

Special Tax: CONTRACT FOR IMPROVEMENTS: MUNICIPAL INDEBTEDNESS. A city expressly authorized by statute may levy a special tax for a public purpose and pledge or appropriate the same for a series of years, and if, in a contract for making the public improvement for which such tax is levied, the city limits its liability to the mere duty of levying and collecting such tax, no municipal indebtedness is incurred within the meaning of the constitution.

City Indebtedness: WHEN A MORTGAGE DOES NOT IMPLY SAME: The fact that a contract for the construction of a waterworks system provides that the city shall give a mortgage on the system to secure the bonds to be issued, does not imply that a municipal debt is to be created.

When Same Rule Applies to Local and General Assessments. A city may, when authorized, provide a special tax on all property within its jurisdiction, pledging it for that purpose, and keep within the rule applied to local assessments.

*Appeal from Wapello District Court.*—HON. ROBERT SLOAN, Judge.

SATURDAY, OCTOBER 25, 1902.

ACTION in equity to enjoin the issuance of certain bonds, and to declare void a certain contract entered into by the defendant city for the construction of a system of waterworks. From the order of the district court granting an injunction as prayed, the defendant appeals.—*Reversed.*

*Jaques & Jaques* and *Mitchell & Hunter* for appellant.

*Seneca Cornell* and *Wm. McNett* for appellee.

WEAVER, J.—The facts upon which this litigation depends are not in dispute. The defendant city, being already indebted nearly or quite to the full constitutional limit of five per cent. of all its taxable property, and being desirous of constructing a system of waterworks, undertook to effect that purpose in the manner provided for in chapter 5 of title 5 of the Code, and to that end the city council enacted certain ordinances, the provisions of which, so far as material, are as follows (ordinance No. 566):

"Be it ordained by the city council of the city of Ottumwa, Iowa.

"Section 1. That the city accepts and elects to exercise the powers granted it by chapter 5, title 5, of the Code of Iowa of 1897, and amendments thereto, and to acquire by purchase or erection, under the provisions of said law, a system of waterworks for the purpose of supplying the city and its inhabitants with water.

"Sec. 2. That for the purpose of creating a sinking fund to be used in the purchase or erection of a system of waterworks, there is hereby levied for the year 1899, and each year thereafter until the purchase price or contract price of said system of waterworks is fully paid, a tax of two (2) mills on the dollar upon all property within the corporate limits of the city of Ottumwa, excepting lots greater than ten acres in area used for horticultural or agricultural purposes. The proceeds of such tax levy shall be used exclusively to pay the purchase price or cost of

construction of such system of waterworks, and any bonds, mortgages, or other obligations issued to pay such purchase price or costs of construction, as the case may be, and the interest thereon, and shall be collected, managed and disposed of as provided by law, and by ordinances not inconsistent therewith.

"Sec. 3. That there shall be levied each year upon all taxable property lying within the limits of benefit and protection of the waterworks purchased or constructed, from and after the purchase or construction of the same, by the city of Ottumwa a water tax of five (5) mills on the dollar, or so much thereof as may be necessary, together with the net proceeds of water rents collected from the consumers of water, to pay the cost of maintenance, repairs, and operation of said waterworks, and the cost of extensions thereof and additions, and improvements thereon, and to pay any of the purchase price, or cost of constructing said works, or bonds or mortgages issued therefor, or interest thereon, which shall not be paid from the proceeds of the two mill tax provided for in section two hereof."

Section four provides for negotiations for the purchase of the works of the City Water Supply Company.

Section five provides that upon failure to make such purchase the city engineer shall be directed to prepare plans and specifications for the erection of waterworks, and that the council, upon approval of such plans, proceed to advertise and let the contract for such improvement to the lowest bidder.

"Sec. 6. (As amended by Ordinance No. 594.) That for the purpose of creating a special fund to be held by the city in trust for the sole purpose of paying the cost of erecting a system of waterworks as contemplated by Ordinance No. 566, in the event that the electors of the city of Ottumwa shall, at a special election called for that purpose, cast a majority of their votes in favor of the approval of a contract by the city entered into for the construction

of such waterworks, the city shall issue, in the manner prescribed by chapter five of the Code of Iowa of 1897, a sufficient number of bonds, which, together with the sinking fund on hand, will be sufficient to pay the contract price for the erection and completion of said system of waterworks and all other expenses connected with the completion of said waterworks and all other expenses connected with the completion and the putting of said plant into successful operation. Said bonds shall be issued in denominations of not less than one hundred ($100) dollars, nor more than one thousand ($1,000) dollars, each to bear interest at a rate not exceeding four and one-half per cent. per annum, interest payable semiannually.' The bonds shall be payable as follows: Five thousand ($5,000) dollars, at the end of two years from the date thereof; five thousand ($5,000) dollars at the end of each succeeding year thereafter for a period of twenty-two (22) years, and at the end of which time the city reserves the right to refund all of the outstanding bonds; and after a period of twenty-two (22) years from the date thereof said bonds shall be payable in the sum of not less than ten thousand ($10,000) dollars per year for not exceeding fifty years from the date thereof, unless there shall be a fraction thereof only left, in which event bonds shall only be issued for such fraction. The payment of said bonds and the interest thereon shall be secured by a mortgage on said system of waterworks, and to the payment thereof shall be pledged the entire proceeds of the two mill sinking fund tax provided for in section two of said Ordinance No. 566, and so much of the proceeds of the water rates and rentals collected from consumers and of the water tax provided for in section three of said Ordinance No. 566, as shall not be needed for the maintenance and operation, repairs and proper and necessary extensions, additions and improvements of said waterworks. Said bonds to be sold in the market for not less than par, and the money received therefrom shall be held by the city of

Ottumwa as a special and trust fund for the sole purpose of paying expenses of the construction and completion of said waterworks plant. The contract for the erection of the same shall specifically provide that the payment for said plant shall be made out of said funds only and out of the two per cent. sinking fund on hand at the time the contract is made, and that the city will assume no other obligation than that of negotiating and selling said bonds and holding said fund for the purpose of paying for said plant, and said fund shall not under any circumstances be devoted to any other purpose than the payment for said waterworks. Said bonds may be negotiated and sold either as a whole prior to the commencement of said work and after the ratification of the contract by the city entered into for the construction of said waterworks by the electors of said city, or they may be negotiated and sold as the work progresses in sums sufficient to pay the monthly estimates on said work, or they may be turned over to the contractor in payment for the work as it progresses if the contract for the works shall so provide and the city shall have the right to so contract.

"Sec. 7. No part of the cost of said waterworks, or any of the bonds issued therefor as hereinbefore provided for, or of the interest thereon, shall ever be paid out of the general funds of said city, or out of any fund or the proceeds of any tax, other than the property and funds specifically named and pledged in section six hereof, and this provision and limitation shall be recited in said bonds."

Pursuant to said ordinances the council caused the necessary plans and specifications to be prepared, and thereafter entered into a contract with the Fruin-Bambrick Company for the construction of a system of waterworks at an expense of about $400,000. The provisions of said contract, so far as pertinent, are as follows: "This article of agreement, made and entered into by and between the city of Ottumwa, Iowa, * * * party of the first part, and

the Fruin-Bambrick Construction Company, * * * as party of the second part, witnesseth: That for and in con sideration of the sum of three hundred and ninety-eight thousand nine hundred and ninety-one ($398,991.00) dol- lars, to be paid by the party of the first part at the time and in the manner provided for by the plans and specifica- tions and by the ordinances and resolutions passed and adopted by the city of Ottumwa in relation to the construc- tion of said waterworks, second party hereby agrees to erect. for the city of Ottumwa, Iowa, and complete and put into successful operation in all its parts and all of its details, a complete system of waterworks according to the plans and specifications heretofore adopted by the city council, together with the amendments thereto. Said plant to be paid for in detail according to the bid of the said party of the second part as accepted by the city council. [Here follow the various items making up the entire work to be performed, and the separate prices or values attached to each, making up the aggregate of $398,991.] The city, on its part, agrees to pay the sum above mentioned to the party of the second part at the time and in the man- ner provided for in the plans and specifications out of a trust fund to be created therefor by mortgaging said plant and pledging the two-mill water levy for sinking fund, the regular water levy and the surplus, if any, of the earnings of said plant, as provided for in chapter five of the Code of Iowa, 1897, to secure the payment of waterworks bonds in the sum of not exceeding four hundred thousand ($400,000) dollars. Said mortgage and bonds to be executed and negotiated as soon as practicable after the approval of this contract by the electors of said city at a special election to be called for that purpose, and the money so realized there- from shall be and remain a special and trust fund to be used solely for the payment for said waterworks and the putting of it into successful operation, and for no other purpose. The city and the parties of the second part both

agree that the city shall not in any manner become liable for the payment for said waterworks out of its general fund or general revenue, but that the contractor shall look alone to the special fund to be created as hereinbefore provided for payment, and the city assumes no other or further liability or obligation than the creation and execution of said trust and the faithful application of the trust fund to the payment for said waterworks plant as provided for by the ordinances of said city and its plans and specifications."

Thereafter, at an election called for that purpose, as provided by law, this contract was ratified and approved by the vote of the people. Upon these conceded facts the plaintiff, who is a citizen and tax payer of the city, brings this action, alleging that the effect of said contract, and of the ordinances under which it was executed, is to create an indebtedness against said city in excess of the constitutional limit, and should, therefore, be enjoined.

I. The Code provisions under which defendant justifies its contract are found in the following sections:

"Sec. 742. Tax-sinking fund. Cities of the first class shall have power to levy, in addition to the regular water tax authorized by law, a tax of two mills upon the dollar upon all of the property within the corporate

1. SPECIAL tax: statutes construed. limits of said cities, excepting lots greater than ten acres in area, used for horticultural or argicultural purposes, for the purpose of creating a sinking fund, to be used as provided in this chapter, for the purchase or erection of waterworks in such cities.    *    *    *

"Sec. 743. Diversion of fund. Any member of the council, or any officer of any city levying and collecting taxes under the provisions of this chapter, who shall in any manner participate in or advise the diversion of any part of said tax to any other purpose than that provided for in this chapter, shall be deemed guilty of the crime of embezzlement, and shall be punished accordingly.

"Sec. 744. Cities of the first class are hereby authorized to purchase or erect waterworks, under the provisions of this chapter, for the purpose of supplying said cities and the inhabitants thereof with water, and are authorized to continue the levy of the two mill tax herein provided for, until the purchase price, principal and interest, or cost incurred by the erection of said works is fully paid and discharged."

Section 745, as amended by chapter 23, Acts 27th General Assembly: "Cities levying such sinking fund tax are hereby authorized to contract for the purchase or erection of waterworks, and, upon the approval and adoption of such contract as hereinafter provided, to apply such sinking fund upon the cost thereof, and cities so purchasing or constructing and those now owning such waterworks are authorized to pledge the proceeds of the continuing two-mill levy provided for in this chapter, and the regular water levy and the net revenues derived from the operation of the waterworks, and shall have the right to mortgage or bond such works, to secure the payment of the purchase price or the cost of constructing such waterworks, but no part of the general fund of such cities shall be applied upon such contracts, bonds or mortgages. In the payment thereof, the city and holders of said contract, bonds or mortgages shall be restricted to the proceeds of the said taxes and the net revenues of the said waterworks, as hereinbefore provided; and such contract or bonds shall not bear a higher rate of interest than five per cent. per annum, payable semiannually."

"Sec. 894. Any city shall have power to levy annually the following special taxes: * * * (5) A tax not exceeding, in any one year, five mills on the dollar, which, with the water rates or rents authorized, shall be sufficient to pay the expenses of running, operating and repairing waterworks owned and operated by any city or town and the interest on any bonds issued to pay all or any part of

the cost of the construction of such works; but such tax shall not be levied upon property which lies wholly without the limits for the benefit and protection of such works, which limits shall be fixed by the council each year before making the levy."

These sections indicate beyond all question the intention of the legislature to empower cities of the first class to purchase or erect waterworks, and to provide a plan by which the cost of such improvement may be met. An examination of the ordinances and contract in controversy make it equally clear that the defendant city has kept within the powers sought to be conferred by the statute above quoted. It follows that the contract is valid, and its performance cannot be enjoined, unless we find it void by reason of the provision in our state constitution which reads as follows (section 3, article 11): "No county or other political or municipal corporation shall be allowed to become indebted in any manner or for any purpose to an amount in the aggregate exceeding five per centum on the value of the taxable property within such county or corporation." The statute we have under consideration does not, in terms or by necessary implication, provide for the creation of any indebtedness by a city in excess of the limit here named, and therefore cannot be said to be void for unconstitutionality.

II.    But the finding of the constitutionality of the statute does not necessarily imply the validity of all contracts made thereunder, for, if the obligation assumed by the city in such an enterprise is a "debt" within the meaning of the constitution, it is valid only when such debt is within the five per cent. limit.    Here we have indicated the vital question in the case before us.    Does the contract create an indebtedness against the city?    If answered in the affirmative, the judgment of the trial court is right, and must be affirmed; but, if answered in the negative,

2. SPECIAL tax; contract for improvements: municipal indebtedness.

the judgment should be reversed, and the injunction dis-
solved. Many of the state constitutions contain a restric-
tion upon municipal indebtedness substantially like that
above quoted from our own, and, where such provision is
not ingrafted upon the constitution, restraint of like na-
ture is generally exercised by legislative enactment.
Given its plainest and most literal signification, the word
"indebtedness" includes every obligation by which one
person is bound to pay money, goods, or services to an-
other. Webster's Dictionary. "Debt." Such is undoubt
edly the meaning of the word in the common usage of
English-speaking people, and there are not wanting author-
ities which extend it to mere moral obligations arising
from contracts unenforceable at law. *Mayor etc. v. Gill,*
31 Md. 375. As applied to a municipal corporation,
"debt," if given its broadest signification, would include
not only obligations for extraordinary expenditures but
every outstanding warrant upon the treasury, the accruing
salaries of officers, and expenses daily arising for water
supply, street lighting, street repairs, and other like legiti-
mate purposes. It can be readily seen that such rigid
literal interpretation of the word in construing the consti-
tutional provision would completely paralyze municipal
power in every city whose debt has reached the prescribed
limit, and, while courts have propounded the general prop-
osition that the language of the constitution in this respect
is "exceedingly broad, and should have no narrow or
strained construction" (*French v. City of Burlington,* 42
Iowa, 614), and must be given "its fair and legitimate
meaning and general acceptation" (*Grant v. City of Dav-
enport,* 36 Iowa, 401; *City of Springfield v. Edwards,* 84
Ill. 626), a careful examination of the decisions discloses
the fact that in substantially every jurisdiction the word
"debt" or "indebtedness," as used in the limitation placed
upon municipal power, is given a meaning much less broad
and comprehensive than it bears in general usage. This

tendency has been more marked in some states than in others, with the result that the decisions are sufficiently at variance to fairly justify the statement of an eminent court that, "in view of the warring among the adjudged cases, it is not easy to affirm that the word 'debt' has a firmly settled meaning." *City of Valparaiso v. Gardner,* 97 Ind. 1, 49 Am. Rep. 416. That "debt" has not a fixed or invariable signification is illustrated by the following authorities: Bouvier defines it as "a sum of money due by certain and express agreement." See, also, to the same effect, 1 Jacob, Law Dictionary, 197, 198. But Bouvier further says that "in an enlarged sense the term denotes any kind of just demand," which latter definition is broad enough to include claims based upon tort as well as contract. In *Stokes v. Mason,* 10 R. I. 261, "debt" is held to be equivalent to "claim" or "demand"; but in *Cable v. McCune,* 26 Mo. 382, 72 Am. Dec. 214, the contrary doctrine is held. An obligation which is not yet due and payable has been held not to constitute an "indebtedness." *Lum v. The Buckeye,* 24 Miss. 565. See, also, *Trowbridge v. Sickler,* 42 Wis. 419; *Slutts v. Chafee,* 48 Wis. 618, 4 N. W. Rep. 763. To the contrary, see *Yocum v. Allen,* 58 Ohio St. 280, 50 N. E. Rep. 909. A contingent liability to pay is not an "indebtedness." *Wentworth v. Whittemore,* 1 Mass. 471; *People v. Arguello,* 37 Cal. 524; *May v. Hammond,* 144 Mass. 151, 10 N. E. Rep. 751. To the contrary, see *Berg v. Radcliff,* 6 Johns. Ch. 302; *State v. Medbery,* 7 Ohio St. 535; *City of Springfield v. Edwards,* 84 Ill. 632. Fines and penalties are not debts. *State v. Mace,* 5 Md. 337; *Robertson's Case,* 27 Tex. App. 628, 11 S. W. Rep. 669, 11 Am. St. Rep. 207. To the contrary, see *In re Shaner,* (C. C.) 39 Fed. Rep. 869. An equitable obligation to pay is a debt. *Longworth v. Mitchell,* 26 Ohio St. 334; *Thompson v. Thompson,* 4 Ohio St. 351. To the contrary, see *People v. Halsey,* 37 N. Y. 344. These illustrations might be continued almost indefinitely.

The extent to which it has been held that cities may assume "obligations" without incurring "debt" within the meaning of the constitution may be seen by reference to a few illustrative cases. In *Dively v. City of Cedar Falls*, 27 Iowa, 227, we held that, if a city has the means in its treasury to meet its indebtedness, the issuance of warrants in excess of the five per cent. limit is not a violation of the constitutional prohibition. Going a step farther, it has been held that a city may "anticipate" the collection of taxes, and in defraying ordinary expenses may make appropriations and incur valid obligations to pay "in advance of the receipt of its revenues," even though the treasury be empty, and the city be otherwise indebted to the full limit. *Grant. v. City of Davenport*, 36 Iowa, 396. Warrants issued in anticipation of the revenue do not come within the constitutional restriction, notwithstanding the revenue impliedly pledged to their payment is wrongfully diverted to other uses. *Phillips v. Reed*, 107 Iowa, 331; *City of Cedar Rapids v. Bechtel*, 110 Iowa, 198. A city may enter into a valid contract covering a long term of years for water, lights, and other similar expenses, agreeing to pay therefor in installments as furnished, although the aggregate of payments, thus to be made is largely in excess of the five per cent. limit; the explanation assigned for this holding being that the debt for each year is not to be considered as accruing until the service for that year has been rendered. *Grant v. City of Davenport, supra*; *McBean v. City of Fresno*, 112 Cal. 159 44 Pac. Rep. 358, 31 L. R. A. 794, 53 Am. St. Rep. 191; *Saleno v. City of Neosho*, 127 Mo. 627, 30 S. W. Rep. 190, 27 L. R. A. 769, 48 Am. St. Rep. 653; *City of Valparaiso v. Gardner*, 97 Ind. 1, 49 Am. Rep. 416. Salaries of public officers, court expenses, and other money obligations imposed upon municipalities by the constitution or by statute are not rendered uncollectible by reason of a general indebtedness to the constitutional limit. *Lewis v. Widber*,

99 Cal. 412, 33 Pac. Rep. 1128; *Rauch v. Chapman*, 16
Wash. 568, 48 Pac. Rep. 253, 36 L. R. A. 407, 58 Am. St.
Rep. 52; *Grant Co. v. Lake Co.*, 17 Or. 453, 21 Pac. Rep.
447. The same doctrine is impliedly indorsed by this court
*arguendo* in *Grant v. City of Davenport, supra*. A con-
trary view is indicated in *People v. May*, 9 Colo. 98 (10
Pac. Rep. 641), but the same court has so far departed
from its rule of strict construction as to hold that a county
indebted to the full constitutional limit may lawfully
assign its annual revenue accruing from uncollected taxes,
provided such assignments are not in excess of the annual
levy. *People v. May*, 9 Colo. 404 (12 Pac. Rep. 838).
This rule also prevails in Illinois, where the court is dis-
posed to construe the restriction upon indebtedness very
strictly against all municipal corporations. It is there
held, in effect, that city warrants issued in anticipation of
its revenues are to be treated as assignments to the holder.
It is further held that the holder of such warrants assumes
the risk of the taxes proving sufficient for their payment,
and that such instruments do not represent any municipal
debt. *City of Springfield v. Edwards*, 84 Ill. 632. In
*Dively v. City of Cedar Falls*, 27 Iowa, 227, this court
said: "If A should undertake to build a courthouse with-
in three years, doing so much, and to be paid accordingly,
each year, the obligation of the contract would arise when
executed, but the indebtedness, under the constitution,
would be measured by that to be paid each year." The
point thus illustrated not being directly involved in that
case, the language quoted has since been called "pure
dictum." *Windsor v. City of Des Moines*, 110 Iowa, 188.
The principle announced in the dictum just quoted is ap-
proved by the supreme court of California as good law.
In an action upon a contract for the building of a court-
house the county sought to avoid liability on the ground
that the contract price of the work. was in excess of the
revenue for the year in which the contract was made, and

therefore in violation of the constitution prohibiting such indebtedness. The court refused to sustain this objection, and held that the contract did not, at the time of the execution thereof, create any liability, but the debt was one which arose from year to year in separate amounts. *Smilie v. Fresno Co.*, 112 Cal. 311, 44 Pac. Rep. 556. See, also, 1 Dillon, Municipal Corporation (3d Ed.) 135, and *Weston v. City of Syracuse*, 17 N. Y. 110.

There are yet other obligations more analogous to the contract in the present case, which are usually held not to create municipal indebtedness in the constitutional sense of the term. Among these are contracts for the construction of sewers, street improvements, and other works, the expense of which is by special assessment laid upon certain specific property or districts supposed to receive special benefits from the work so performed. In such cases, though the money may be payable through the general treasury, and though the city may have issued certificates, warrants, or bonds therefor, yet, if the contract be such that its nonpayment will not justify a judgment against the city, or the enforcement of a charge against its assets, or a resort to general taxation, it does not create an indebtedness of the city. *Quill v. City of Indianapolis*, 124 Ind. 292, 23 N. E. Rep. 788, 7 L. R. A. 681; *Davis v. City of Des Moines*, 71 Iowa, 500; *City of Clinton v. Walliker*, 98 Iowa, 655; *Baker v. City of Seattle*, 2 Wash. 576, 27 Pac. Rep. 462. In connection with these special assessment cases it may also be remarked that we have lately held the city liable generally to the contractor for a failure to make proper special assessments for the work done, and that the liability thus incurred is not affected by the constitutional limitation. *Ft. Dodge Electric Light and Power Co. v. City of Ft. Dodge*, 115 Iowa, 568. But the doctrine that an obligation payable out of a special fund, and not enforceable against the municipality generally, is not a municipal indebtedness within the meaning of the

constitutional limitation, has not been confined to the matter of special assessments. It is true there are many cases in which, notwithstanding the creation of a special fund for the payment of the claim, the courts have held the contracts void, as being in violation of the constitution; but, as we shall hereinafter see, these holdings are largely based upon the fact that, notwithstanding such special fund, the contracts have been so framed as to provide also for a general liability upon the part of the city. Illustrative of this statement we may cite *Read v. Atlantic City,* 49 N. J. Law, 558 (9 Atl. Rep. 759.) Under a law of New Jersey a city had no power to incur indebtedness in excess of $35,000. Atlantic City having undertaken to make improvements in excess of the limitation and in excess of the current revenues, the contract was held void. In pronouncing the law of the case, the court, after referring to the authorities, proceeds: "It is impossible, perhaps, to reconcile all these cases. The true interpretation of such restrictions upon municipal indebtedness is, in my judgment, between the extremes they exhibit. The plain object of such restriction is to require that all moneys which are paid for municipal expenses after the debt has reached the fixed limit shall be raised by taxation. In view of the object, it is clear (and all the cases agree in this) that prohibitions are not to be construed as limited to obligations which are debts *eo nomine,* but are to be extended to all contracts for the payment of money, or contracts whereon the payment of money can be enforced; but where the money to be paid upon such contract is provided for to be raised under some fixed and definite scheme, such contracts are not, in my judgment, within the prohibition. Where, however, the money required to meet such contracts is not provided for, either by being legally ordered to be raised by taxation and appropriated for that purpose, or by some legislative scheme which positively prescribes that it shall be raised by taxation and appro-

priated for the payment as needed, then such contracts do increase the indebtedness within the meaning of the prohibition." The same idea is announced by the supreme court of Indiana in *Sackett v. City of New Albany*, 88 Ind. 473 (45 Am. Rep. 467), where it is said: "By 'indebtedness,' in this connection, we mean an agreement of some kind by the city to pay money where no suitable provision has been made, for the prompt discharge of the obligation imposed by the agreement." This language is quoted with apparent approval in *Beard v. City of Hopkinsville*, 95 Ky. 239 (24 S. W. Rep. 872, 23 L. R. A. 402, 44 Am. St. Rep. 222), a leading case usually cited in support of the doctrine of strict and literal construction of the constitution. See, also, *People v. Pacheco*, 27 Cal. 175. It has also been decided that a contract by a city for the construction of a system of waterworks, whereby seventy-five per cent. of the income from such works is to be set aside as a special fund for the payment of the expense thus incurred, and the contractor undertakes and agrees to look to such fund alone for his compensation, and obtains no right of recovery out of the general funds of the city, does not create a municipal indebtedness. *Winston v. City of Spokane*, (Wash.) 41 Pac. Rep. 888; *Faulkner v. City of Seattle*, 19 Wash. 320 (53 Pac. Rep. 365). It has been said by some courts that it is not essential to the existence of debt that the creditor shall have any remedy at law or in equity for its enforcement. *Mayor, etc., v. Gill*, 31 Md. 375; *Brown v. City of Corry*, (Pa.) 34 Atl. Rep. 854. On the other hand, it is held by the supreme court of Wisconsin that debt: "denotes not only an obligation of the debtor to pay, but the right of the creditor to receive and enforce payment." *Perrigo v. City of Milwaukee*, 92 Wis. 236 (65 N. W. Rep. 1025); *City of Milwaukee v. Milwaukee Co.*, 95 Wis. 424 (69 N. W. Rep. 819); *Burnham v. City of Milwaukee*, 98 Wis. 128 (73 N. W. Rep. 1018). The cases last cited, though not parallel in

fact, have a direct and important bearing upon the question as to the effect of a contract with a city whereby the municipality, although undertaking the expenditure of money, is expressly exempted from liability to suit or judgment for the enforcement of the agreement. Wisconsin has a constitutional limitation upon. municipal indebtedness much like our own. By an act of its legislature power was given to cities to "purchase upon credit" lands for public parks, and to that end it was provided that "for such purpose the proper officers of said city may execute and deliver to the vendor of such land an instrument creating a lien thereon for the purchase money, without creating a corporate liability therefor, to secure the whole or any part of the price in installments." Acting under the authority thus conferred, the city of Milwaukee purchased lands on credit to a large aggregate amount. These contracts provided that, in case the city should make a certain payment in cash at the execution of the contract, and the remainder of the agreed price in specified future installments, then the seller would, on demand, convey the said land to the city by deed with the usual covenants. In the meantime the city was entitled to the use and possession of the premises, but in case of failure to make the payments as agreed the seller should have the right by action at law or in equity to foreclose the city's right of redemption, and sell the land to make his claim. It was further agreed that the unpaid portion of the purchase price should not create a corporate liability against the city in any manner or form. These contracts were the subject of litigation in the three cases last mentioned, and in each instance were held to create no municipal indebtedness. The authority of these holdings has been expressly recognized by this court. See *Windsor v. City of Des Moines*, hereinafter referred to. The Montana court in a recent case, after reviewing its former decisions and other

precedents, states the rule as follows: "When a. municipality has exceeded the constitutional limit of indebtedness, a contract for water supply under which the city is liable generally is an indebtedness within the meaning of the constitution. In such case the liability is general, and is payable out of all its revenues." But when the liability is special, and is limited to the amount of the special tax, the levy of which is expressly authorized by law, it is not such an indebtedness. *State v. City of Helena*, (Mont.) 68 Pac. Rep. 104 (55 L. R. A. 336, 81 Am. St. Rep. 453).

Of the leading cases cited in opposition to the general line of authorities we have cited perhaps none are more nearly in point than the following, already mentioned: *Mayor, etc v. Gill, supra*; *Brown v. City of Corry, supra*; *City of Springfield v. Edwards, supra*; *Beard v. City of Hopkinsville, supra*. Of these it may be said that none pass directly upon the question as to the effect of a contract in which corporate liability is expressly waived, and the source of payment is limited to a special fund or special tax provided for by law for that express purpose. In *Mayor, etc., v. Gill*, the city was the owner of certain securities, which it undertook to put up as collateral to a loan, and sought to avoid the constitutional limitation by providing for a sale of the collateral, instead of an action against the city, and the court very properly held the contract void. With this result we may readily agree without feeling bound to adopt all the reasoning made use of in the opinion. It is enough to say the decision is not here in point. Of *Brown v. Corry* it may be said that one of the points most forcibly made by the court was that the contract therein validated did in fact impose a general liability upon the city. In *City of Springfield v. Edwards* the question turned upon the right of the city to anticipate taxes for the current year, and the opinion expressly declines in part to follow the precedent already set by the Iowa cases. *Beard v. City of Hopkinsville* involved a

matter of water rentals and street lighting, for the expense of which no special fund or special tax was provided.

If now we turn to our own decisions, we find that the principle involved in the present appeal has been more or less directly considered by us on several occasions. As already shown, we are firmly committed to the doctrine that bonds or certificates made payable from the proceeds of special assessments upon property or districts for local improvements are not evidences of city indebtedness. *Davis v. City of Des Moines*, 71 Iowa, 500; *City of Clinton v. Walliker*, 98 Iowa, 655; *Tuttle v. Polk*, 92 Iowa, 433. . This is equally true as to the right of the city, indebted to the constitutional limit, to anticipate its revenues for current expenses. *Grant v. City of Davenport, supra*; *Tuttle v. Polk, supra.* We have also given our adherence to the doctrine that under a contract for water rentals for a series of years no indebtedness arises except as the service contracted for is rendered. *Grant v. City of Davenport, supra*; *Creston Waterworks Co. v. City of Creston*, 101 Iowa, 687. We have held that a city may, under some circumstances, "assume an obligation to pay money without incurring a debt in the constitutional sense." *Tuttle v. Polk, supra.* In *Dively v. City of Cedar Falls* we said, in effect, that if the city had funds applicable to their payment, warrants drawn in excess of the five per cent. limit do not represent an indebtedness as the word is used in the constitution. In *Grant v. City of Davenport* we reasserted that doctrine, and further held that, even if there be no money in the treasury, yet current expenses incurred in anticipation of the collection of taxes duly levied do not constitute such indebtedness. The theory upon which this holding is justified is said to be that, while the right to use the current revenues actually in the treasury for current expenses, even as against the claim of creditors, "is absolutely necessary to the life of the municipality and to the successful accomplishment of the

purposes of its creation," it is equally legitimate to make
such appropriation "in advance of the receipt" of the rev-
enues, "because that the revenues will be received is a
legal certainty." In this proposition, so clearly stated by
Cole, J. (*Grant v. City of Davenport*), is to be found, in
our judgment, the principle which underlies all the cases
which hold that obligations incurred in anticipation of
revenues yet to be collected and those incurred in antici-
pation of or reliance upon a special fund pledged to their
payment are not to be regarded as "debts" in applying
the constitutional limitation. Moneys, the receipt of which
is thus assured, are regarded as for all practical purposes
already in the treasury, and contracts made upon the faith
thereof are treated as cash transactions. No deficiency is
created, and therefore no debt. In other words, so long
as any particular fund has cash in the treasury, or taxes
which can be legally anticipated for its benefit, no appro-
priation thereof within the limits of such actual and pros-
pective revenue will have the effect to create an indebted-
ness. *Burlington Water Co. v. Woodward*, 49 Iowa, 58,
presented a case where the city acting under statutory
authority, entered into a contract with a private corpora-
tion to construct certain waterworks under an agreement
whereby a special tax was levied from year to year, and
the moneys thus realized, together with the earnings of
the system, should constitute a water fund. This fund
was made to provide for the payment of the interest on
bonds issued by the company, for the purchase or retire-
ment of said bonds from time to time, for taxes and ex-
penses, for a specified dividend to stockholders, and for the
creation of a sinking fund for the extension and improve-
ment of the works. The special tax was never to be so far
diminished as to prevent the payment of the specified div-
idend upon the stock of the company. It was also agreed
that, when the financial condition of the city would admit,
it had the right to purchase and control the works by

assuming the duties and liabilities of the company. The mayor of the city was required to indorse upon each bond of the company a certificate showing the assessed value of the property upon which the special tax was annually to be levied, together with a stipulation that from the water fund the city would pay the interest, and pay the farther sum of $2,000 annually into the sinking fund, before any money should be taken out of said water fund for any other purpose. It will be seen from this statement that the obligation of the city was not only to levy the special tax for the current year, but to continue the same undiminished through a period of years in the future, for the benefit of the water fund, from which it agreed to pay the interest accruing to the bondholders, the yearly debt to the sinking fund, and dividends to the stockholders,—an obligation which would seem to contain all the essential elements of debt if we adhere strictly to the lexicographers' definition of the word. Relying upon that theory, the mayor of the city refused to make the agreed certificate upon the bonds, and, suit being brought to compel such action on his part, he answered, among other things, that, at the time the contract with the water company was entered into, the city was already indebted to an amount exceeding the constitutional limit. To this answer a demurrer was sustained, and upon appeal to this court the ruling was affirmed. This decision does not turn, as counsel for appellee seem to think, upon the rule in the *Grant Case* and *Creston Case*, to the effect that contracts for water rentals create indebtedness only as the successive installments may be earned; but is expressly made to rest entirely upon these two propositions: (1) That the provision as to the purchase of the works provides for a mere option which the city was under no obligation to exercise, and therefore no debt was thereby incurred; and (2) that the agreement to pay the interest upon the bonds, the installments to the sinking funds, and dividends to stock-

holders was limited to the special tax alone, and therefore did not create a municipal indebtedness. In reference to this latter proposition it is said: "The tax required to be levied is clearly authorized by statute, and such tax, with the income of the company derived from other sources, the ordinance expressly provides shall pay all the obligations assumed by the city. If it does not, neither the bondholders nor the company have any claim on the city for the deficiency. The obligation of the city is to levy the tax, and see that the amount collected is applied to the specified purposes. If the special fund legally provided is not sufficient, then it may well be said the deficiency is not payable by the city; and it is difficult to conceive that there can be such a thing as a debt which is never to be paid. No burden is created thereby, and there cannot be such an indebtedness. In a constitutional sense the prohibited indebtedness must be a burden, and payable from funds which could not constitutionally be appropriated to that purpose." This authority, reduced to briefest terms, distinctly holds that the city may levy a special tax for a public purpose whenever expressly authorized by the legislature to do so; that such special tax may be pledged or appropriated for a series of years in advance in furtherance of the purpose for which it is provided; that the city may by contract limit its liability to the mere duty of levying and collecting the special tax, and that under such contract no municipal indebtedness is incurred within the meaning of the constitution. In *French v. City of Burlington*, 42 Iowa, 614, the court, in declaring the invalidity of certain city indebtedness, is careful to say, "It must not be overlooked that the debt thus created was payable out of the current revenues of the city, and not from any special fund." In *Allen v. City of Davenport*, 107 Iowa, 90, involving the validity of a certain paving contract and certain bonds issued by the city, to be paid only from special assessments, we found the contract void because it

bound the city generally for the cost of paving, and was in excess of the constitutional limit; but the bonds were not invalidated because payable out of a special fund, and no general corporate liability was assumed.    We there said, after citing the language above quot^d from *Water Co. v. Woodward*: "From this quotation we are able to gather the true rule, if the city obligates itself to pay, no matter· what its revenues from special assessments, a debt is created, which falls within the constitutional inhibition. If, however, it simply appropriates a part of its revenues, and pledges them to the payment of its obligation, or if it simply undertakes, as trustee or agent, to collect these assessments, and apply them upon the work, without liability on its part for anything further, then no debt is created, or if it has on hand at the time the debt is created a sufficient fund to meet the indebtedness, or if the debt is payable in installments, and it has enough in its hands at the time. the installments mature to pay them, then there is no debt in a constitutional sense."    The case of *Windsor v. City of Des Moines*, 110 Iowa, 175, involved a contract entered into by the city for the construction of an electric light plant, and the question which we there undertook to decide was whether such contract created a debt within the constitutional inhibition.    That question was decided in the affirmative, and the contract held to be void, as creating a debt beyond the five per cent. limit. The opinion clearly recognizes the distinction between contract obligations limited to a special fund provided for that purpose and those which are not thus secured,—a distinction which clearly differentiates the contract there under consideration from the one presented by this appeal.    We there called special attention to the fact that, "at the time the contract was made there was no statute authorizing a special levy for the purpose of constructing electric light plants, and the warrants, when issued, could only be paid out of the general funds," and cited with approval the

language used in *Water Co. v. Woodward* to the effect that, where a special tax is authorized, and the contractor agrees to look to that alone for his compensation, no corporate liability or indebtedness is created. And again, in the same opinion, after pointing. out the distinction between contracts to procure lights for a city and contracts to construct plants for that purpose, and holding the latter is not such an expense as will permit any anticipation of the ordinary revenues of the city, we say: "But when the contract is for the erection of electric light plants, or for any other improvement, and the time of payment is postponed to a later date, and no special tax for the purpose of erecting such works is authorized, the rule seems to be well settled that the sums to become due in the future must be taken into account in estimating the indebtedness of the municipality." This language, taken in connection with the entire discussion, is tantamount to an express declaration that, had there been at that time, as there is in the present instance, clear statutory authority for the levy of a special tax for such work, and the contract had exempted the city from all corporate liability except to collect and pay over such special fund, then the obligation of the city would not be municipal indebtedness within the meaning of the constitution. In the same case (page 182), we had occasion to pass upon a contract by the city for the purchase of cemetery grounds for a large sum of money, part of which was paid down, and the remainder to become due in installments, but reserving to the city the option to quit paying at any time and take title to so much of the premises as had been paid for. On the authority of *Burnham v. City of Milwaukee, supra,* we held that this contract created no indebtedness, because the seller had no claim or demand which could be enforced against the city except to reclaim the land agreed to be sold. In so far, then, as the decision in *Mayor, etc. v. Gill, supra,* is not in harmony with the *Burnham Case* (if in

fact there be any conflict), it is to be noted that this court has declined to recognize its authority.  In the *Allen Case* already referred to, after a careful review of the decisions we declared it to be "the settled rule of this state that, where money to be paid upon contracts is provided for to be raised by taxation upon some fixed and definite scheme, such contract is not within the prohibition."  The force of this declaration is not to be broken by the suggestion that we were then discussing the question of special assessments, as distinguished from special taxation, for the contract there in litigation was one by which the city undertook to pay the cost of paving out of its general revenues.

Some confusion has arisen in the cases as to the extent of the right to anticipate the collection of taxes.  We think, however, it is fairly well settled that, as applied to the ordinary revenues, such right undoubtedly does not extend beyond the current year, nor can it be exercised as to such revenues for any purpose beyond the payment of ordinary expenses.  This is so for the very good reason (to say nothing of other obvious objections) that the rate and levy of such taxes are matter of yearly adjustment, and the revenues to be derived from future levies, as well as the amounts which may be required, are, of necessity, uncertain.  *Windsor v. City of Des Moines*, 110 Iowa, 193. For the current year, the rate having been fixed, and levy made, the receipt of the revenue, as we have said, is "legally certain," and is treated as cash actually in the treasury, and therefore, under the rule in the *Dively Case* and *Grant Case*, an appropriation thereof in advance of the receipt creates no debt.  If, then, a city enters into a contract for an extraordinary expenditure within the scope of its power, and under express statutory authority provides a special or extraordinary fund, either by tax contemporaneously levied for that purpose alone and for the full amount, or by some "fixed and definite plan" of special taxation extending over a period of years, is not the

receipt of such revenue "legally certain," and subject to appropriation, in advance of its actual collection, without the incurring of an indebtedness? If there be any soundness in the reasoning upon which the decisions in the *Dively* and *Grant Cases* are made to rest, it applies with no less persuasive force to the case we have just supposed, which is, in substance, the case at bar. It must be borne in mind that the limit provided by the constitution is upon the power to contract indebtedness, and not upon the power of taxation. It will doubtless be conceded that it would be competent for the legislature to authorize a city to levy in a single year a special tax sufficiently large to construct a suitable system of waterworks. Suppose, then, that under such a statute the city levies the necessary tax, and proceeds at once to let the contract in anticipation of the revenue thus provided. Can it be urged, in the light of the authorities, that this contract creates a municipal debt? We think not. Nor can we conceive that the fact of the tax being extended over a period of years, instead of being all levied in a single year, affects the application of the principle. The plan of taxation is fixed and definite, and its levy and collection from year to year is subject to no discretion, and is as certain in every legal sense as if levied in a single installment. As tending in some respects to support this conclusion, see *Waterworks Co. v. Woodward, supra; Witter v. Board of Supervisors,* 112 Iowa, 380. If, to carry the illustration a little farther, and make its aptness to the present case more apparent, we suppose that by the terms of the statute authorizing such taxation, and by the terms of the city ordinance and of the contract entered into thereunder, no suit can, in any event, lie against the city to recover from its general revenues the amount to be paid for the work done, we are then brought within the principle controlling the decisions in *Winston v. City of Spokane, supra; Faulkner v. City of Seattle, supra; Perrigo v. City of Milwaukee, supra;*

*Burnham v. City of Milwaukee, supra*; and *Water Co. v. Woodward, supra.* The Illinois court, in *City of Spring-field v. Edwards, supra,* in effect announces the same doctrine.   It is there said, in substance, that the collection of revenues may be anticipated by warrants drawn in favor of creditors of the city, provided that circumstances are such that the creditors may be regarded as accepting such warrants and the anticipated funds as a complete dis-charge of their claims, and as waiving all other resort against the municipality.   After referring to other decis-ions, the court proceeds:   "The principle, as we under-stand, is, there is in such case no debt, because one thing is simply given and accepted in exchange for another. When the appropriation is made, and the warrant or order is issued and accepted, the transaction is closed on the part of the corporation, leaving no future obligation, either absolute or contingent, upon it, whereby its debt may be increased."   It is true the court confines its appli-cation of this rule to cases where the tax is actually levied before the appropriation is made, and not to taxes to be levied in the future; but it was there dealing with general or ordinary taxes alone, and, in our view, where a specific and definite tax for a period of years is legally provided for, and the revenue thus certainly assured cannot right-fully be used or applied to any other purpose, the rule thus announced is fairly in point.   The money is in fact provided for, and under the doctrine of *City of Springfield v. Edwards* its appropriation, in advance of its receipt operates, in effect, as an assignment of the city's interest therein,—"an exchange of one thing for another,"—with no resulting increase of the municipal debt; and if, for any reason, the special fund proves insufficient to satisfy the claim made thereon, the loss is the loss of the contrac-tor, and not of the municipality.

The record before us presents a case fairly within the limit of permissible contracts as indicated in the authorities

we have here discussed. The statute expressly authorizes the appellant city to construct waterworks. It also authorizes the creation of a special fund from which the expense of such works shall be met. It exempts the city and its general revenues from all liability for such expense. The city has formally accepted the terms of the statute, and let the contract for the construction of the works. The special fund authorized by the statute has been duly created. The scheme or plan of taxation for the benefit of said fund is fixed, definite, and certain, and the diversion of the moneys thus arising to any other purpose is strictly prohibited. The electors of the city have ratified the contract by popular vote. The end sought to be accomplished by such enterprise is one of public utility, and we find no good reason to condemn it as an unconstitutional exercise of municipal power. In reaching the conclusion we do not overlook or minimize the importance of observing every provision of the constitution according to the evident meaning of the language employed. No rule of construction is better established, nor can the courts be justified in departing therefrom either to avoid apparent hardship or to promote a desirable end. But in this, as in every case where words are to be judicially applied, we are not justified in looking to the dictionaries alone, nor to common parlance alone, for the meaning to be given them. As held by us in *Allen v. Clayton*, 63 Iowa, 11, we may, in a proper case, look beyond the mere form of words employed, and consider the evil intended to be remedied, the contemporaneous legislative construction and practical construction adopted by the people; and under this rule we held in the case cited that the words "every stockholder in a banking corporation or institution"—words broad enough to include every banking corporation in the state —should be construed to refer to banks of issue alone, and not to banks of deposit or discount. In determining whether a statute or contract is in violation of a constitu-

tional provision, "the court looks at the essence as well as the form." *Clark's Case*, 65 Conn. 17, 31 Atl. Rep. 522, 28 L. R. A. 242; *State v. Conlon*, 65 Conn. 478 (33 Atl. Rep. 519, 31 L. R. A. 55, 48 Am. St. Rep. 227). It is easy to say, in the language of some of the books, that "every word is to be expounded in its plain, obvious, common-sense meaning," but the words are very few which require no construction whatever. What is "plain and obvious" to one mind is not always equally clear to another, and the fact is no impeachment of the "common sense" of either. The wide difference of views manifested in the authorities we have mentioned demonstrates that "debt" is no exception to this rule. Were we to give the word the broad significance that some of the authorities would justify, we should destroy the corporate life and efficiency of every municipality which reaches the allowed limit of indebtedness. But the construction we give it has strong support in the decisions of the courts of other states, is in strict line with the opinion we have heretofore frequently expressed, and preserves the integrity of the constitution according to its evident meaning and intent, while entailing no disastrous consequences to the city or to its citizens. The right of a city to construct and own works of public utility, if such rights exist, is one of great importance, and should not be embarrassed or rendered nugatory by strained or technical construction of the constitution or of the statutes. Its importance is not so much in the fact that public ownership is in itself wise or desirable (concerning which there may be much difference of opinion) as in the fact that with such power in reserve municipalities are placed in position to deal with private owners on equal terms, and avoid exactions which their helplessness might otherwise invite.

III.   It is further said that the giving of a mortgage, as provided in this case, is in itself an evidence of indebtedness, and we are cited to the case of *City of Joliet v.*

*Alexander* (Ill.) 62 N. E. Rep. 861.   The authority of that

3. CITY indebt-  decision upon the question there decided may
edness: when
mortgage   be conceded without in any manner modifying
does not im-
ply same.   the opinion we have expressed.   The city of
Joliet, being already the owner of a system of waterworks
with an established revenue of $10,000 per year, undertook
to mortgage said property and pledge its revenues to se-
cure bonds or certificates for a large amount of money with
which to extend said system.   The court held, that, even
though there was no right to recover a general judgment
against the city, yet, as its existing property was pledged
to the payment of the certificates, it constituted a debt,—
a holding which is in accord with *Mayor, etc., v. Gill,
supra*.   The decision proceeds, however, to draw a vital
distinction, which should not be overlooked, in applying
the constitutional restriction upon municipal indebtedness.
It says:  "What is said relative to mortgaging property
owned by the city or pledging its existing income is not
intended to apply to a mortgage purely in the nature of a
purchase-money mortgage payable wholly out of the in-
come, or by resort to such property."   Recognizing the
same distinction, see *Kelly v. City of Minneapolis* (Minn.)
65 N. W. Rep. 115 (30 L. R. A. 281);  *Perrigo v. City of
Milwaukee, supra*.   In the case before us the mortgage is
essentially a purchase-money mortgage.   It covers no
property already owned by the city, and in no manner in-
volves the city in liability to lose any item of property or
of income owned or held by it at the execution of such
instrument.   It must, therefore, be regarded as an excep-
tion to the general rule that a mortgage implies a debt
upon the part of the mortgagor.   *Burnham v. City of
Milwaukee, supra*.

IV.   It is urged in behalf of the appellee that many
of the cases adhering to the so-called "special fund" rule
involve only the matter of special assessments for local im-
provements made by or upon order of a city, and there-

fore are not in point in this discussion. That the two lines of cases are distinguishable in their facts is clear, but that they are unlike in principle is not so apparent. Whether an improvement ordered be for a single street or for the entire city, it is in either case an exercise of the taxing power. *French v. Harber Asphalt Co.*, 21 Sup. Ct. Rep. 625, 45 L. Ed. 879. By virtue of that power the expense thus incurred may, under our statute, in most cases be assessed against all taxable property within the city, and paid out of the general revenue; or it may be assessed against the property in the immediate locality of the improvement. The improvement is not made for the benefit of the adjacent or abutting property, but for the benefit of the city generally; yet, in view of the incident increase in the value of such property, it is deemed just to charge it with the cost of the work, and leave the burden to be equalized by similar assessments against other property as such work shall from time to time be extended. The city orders the improvement, makes the necessary contracts therefor, and determines what form of taxation shall be employed to provide for the expense. If it undertakes the payment from the general revenue, and the expense is in excess of the amount which can properly be appropriated for that purpose from moneys on hand and in course of collection, then a "debt" is incurred to the amount of such excess; but if it creates a special fund by ordering the expense charged to the local district, and limits its liability to such fund alone, no debt is created,—not because there is any magic in the term "special fund," nor because one is charged against the entire city and the other against a part only, but because in the former case a deficiency is created in the funds applicable to such payment, and in the latter there is none. If, then, acting under proper legislative authority, the city, instead of charging itself generally with the cost of a public improvement and

*4. WHEN same rule applies to local and general assessments.*

assuming the risk of any deficiency in its current revenues, provides a special tax upon all the property within its jurisdiction for the amount thus required, and pledges or appropriates it to that purpose without further liability on its part, is not the latter expedient to all intents and purposes within the letter and spirit of the rule which we apply to local assessments? Certainly it satisfies the requirement of *Allen v. City of Davenport, supra,* and *Read v. Atlantic City, supra,* for the "money to be paid is provided for to be raised under a fixed and definite scheme of taxation." It is equally in accord with *Sackett v. City of Albany, supra,* for "suitable provision has been made for the prompt discharge of the obligation."

The views above expressed render unnecessary any discussion of other questions argued by counsel.

The judgment below must be reversed, and cause ordered remanded for further proceedings in harmony with this opinion.—REVERSED.